**LAW OFFICE OF RESHMA KAMATH**
**RESHMA KAMATH,** Cal. Bar No. 333800
2648 International Blvd, Suite 115 #294, Oakland, California 94601
Ph.: (650) 257-0719 | (213) 410-1019
E.: reshmakamath2021@gmail.com
Counsel for Plaintiff JASON ALLEN WHITE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

JASON ALLEN WHITE, an individual,

             Plaintiff,

   vs.

SAN JOAQUIN GENERAL HOSPITAL
AUXILIARY; an organizational entity
COUNTY OF SAN JOAQUIN; a public entity
AND, DOES 1-10, inclusive,

             Defendants.

CASE NO.: 2:25-cv-01808-TLN-SCR

**JASON ALLEN WHITE'S FIRST-AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL.**

---1---

**FIRST-AMENDED  COMPLAINT  FOR  DAMAGES**

## I. THE PARTIES AND JURISDICTION

1. Plaintiff JASON ALLEN WHITE ("Plaintiff" or "White") is, and at all relevant times was, a resident of SAN JOAQUIN COUNTY, California.

2. Defendant SAN JOAQUIN GENERAL HOSPITAL AUXILIARY is a medical facility doing business in Defendant COUNTY OF SAN JOAQUIN, California. (collectively, "Defendant.")

3. Plaintiff is unaware of the true names and capacities of Defendants sued herein as DOES 1-100, inclusive, and for that reason sue said Defendants by such fictitious names. Based on information and belief, each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein referred to, and/or proximately and actually caused injuries and damages to the Plaintiff, as alleged herein. As necessary, and as discovery continues, Plaintiff will file and serve one or more amendments to this pleading upon learning the true names and identities of these DOE Defendants.

4. Plaintiff is informed and believes, and on that basis alleges that there exists, and at all times mentioned herein existed, a unity of interest and ownership between Defendants such that any individuality and separateness between these defendants has ceased. As such, there exists such a unity of interest between Defendants that failure to recognize the alter ego relationship among them would lead to inequitable results.

5. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983 for the deprivation of rights secured by the Fourth and Fourteenth

_____2_____

**FIRST-AMENDED  COMPLAINT  FOR DAMAGES**

Amendments to the U.S. Constitution. This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy. Furthermore, to the extent any defendant is deemed a federal employee, this action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, et seq., which confers exclusive jurisdiction upon the United States District Courts.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within San Joaquin County, which is located within the Eastern District of California. All defendants reside in and/or do business within this district, and the damages resulting from Defendants' misconduct exceed any minimum jurisdictional limits of this Court.

## II. <u>FACTUAL STATEMENTS</u>

7. On February 15, 2024, Plaintiff was admitted to Defendant Hospital following a motor vehicle accident. Upon admission, Defendant's medical team, including emergency and trauma physicians, failed to diagnose a diaphragm tear despite the presence of a hemothorax on Plaintiff's right side. This hemothorax was noted but left untreated at the time of admission.

8. On February 16, 2024, approximately 24 hours after admission, Defendant's medical team decided to place a chest tube due to a growing hemothorax, without fully explaining the procedure, its risks, or potential alternatives to Plaintiff. Immediately after placement of the chest tube, when Plaintiff sat up, there was 640 ml of blood in the chest tube pleuravac. After sitting in a chair to get his bedding changed, another 200ml of blood came out, totaling approximately 840ml of blood within an hour or slightly over. When Plaintiff stood back up,

FIRST-AMENDED COMPLAINT FOR DAMAGES

he experienced intense pain (10/10 on the pain scale) on his right side where the chest tube was placed.

9. Despite Plaintiff's complaints of severe pain and visible signs of rapid blood loss, Defendant's medical staff failed to adequately monitor, report, or treat his deteriorating condition. Plaintiff had the attending physician called and reported his intense pain and that he could feel the suction the chest tube was hooked up to. No change was made other than a trial of turning off the suction to see if that made a difference in Plaintiff's pain, which it did not.

10. The attending physician verbally instructed the nurse to notify him if Plaintiff's drainage reached over 1400 ml. However, there was no documented notification until 1600ml, with no intervention occurring at that time. There was no further documented escalation by the nurse or treatment by the medical team until Plaintiff's rapid response was called.

11. Defendant's nursing staff, particularly the day shift Registered Nurse on February 16, 2024, failed to respond to Plaintiff's repeated calls for assistance throughout the entire shift. Plaintiff's girlfriend had to repeatedly go get the nurse, informing him that Plaintiff was in uncontrolled pain.

12. The same nurse refused to administer pain medication or escalate the issue because Plaintiff was not due for his next dose. He did not provide adequate treatment for Plaintiffs uncontrolled pain, which remained at 10/10 with no relief from any of the regularly scheduled medications provided.

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

13. The day shift nurse on February 16, 2024, only checked Plaintiff's vital signs for his assessment. He did not use a stethoscope during his assessment or perform any manual form of assessment during the shift.

14. Plaintiff was not drinking or eating anything due to the uncontrolled pain that left him unable to move. When Plaintiff's girlfriend informed the nurse that Plaintiff needed an IV because he was not eating or drinking, the nurse dismissed the concern, stating that Plaintiff needed to start drinking and eating because there was no need to give him an IV. The nurse did not escalate the concern or perform any level of intervention.

15. Approximately 6 hours after the placement of Plaintiff's chest tube, as visiting hours were ending, Plaintiff pleaded with his girlfriend not to leave him because he was not receiving adequate care. His girlfriend demanded a nurse come in. The new night nurse who had just received handoff came in, took Plaintiff's blood pressure, which was 70/30, with Plaintiff going in and out of consciousness, and called a Rapid Response.

16. The Trauma, Surgery, and ICU teams all responded to Plaintiff's room. Plaintiff's chest tube pleuravac was completely full with 2.5 Liters of frank blood, with the tube going into his chest totally full as well because there was nowhere for it to drain. The medical team started to give Plaintiff fluid and blood in a rapid infuser in his room and rushed him down for an emergency thoracotomy.

17. During the emergency thoracotomy, it was discovered that Plaintiff's diaphragm tear had worsened to 12 inches, and his liver had moved up into his right lung space. Due to the urgency of the situation, a rib was broken when they opened Plaintiff's chest. When they

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

opened his chest, they suctioned an additional 1.5 liters of blood and blood clots out of his chest cavity. Plaintiff had a total of 4 liters of blood loss.

18. Following discharge on February 23, 2024, Defendant failed to prescribe necessary blood thinners, despite Plaintiff receiving daily blood thinner injections during his hospitalization.

19. As a result of this failure, Plaintiff suffered a pulmonary embolism on March 8, 2024, requiring additional hospitalization for two days and ongoing blood thinner treatment for three months.

20. As a result of Defendant's negligence, Plaintiff has suffered severe injuries including but not limited to: further tearing of his diaphragm resulting in nerve damage and up to 25% permanent loss of lung function; a broken rib from the emergency thoracotomy; neurological issues including short-term memory problems and difficulty with complex tasks; significant scarring, including a large thoracotomy scar stretching from his back to under his nipple line and additional scars from chest tubes; severe pain and suffering; and loss of earnings and earning capacity.

21. Plaintiff's primary insurance Thoracic Surgeon stated that the damage could be up to a 25% permanent loss of lung function. He said Plaintiff's diaphragm nerve damage was extensive due to the tearing. His surgical note mentions a "missed" diagnosis.

22. As of July 19, 2024, Plaintiff continues to experience neurological issues, including daily short-term memory issues and trouble with complex tasks. Plaintiff remains out of work due to these ongoing issues.

_____6_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

23. Defendant's nursing staff, particularly the day shift Registered Nurse on February 16, 2024, failed to respond to Plaintiff's repeated calls for assistance, failed to adequately manage his pain, and failed to properly assess his condition beyond checking vital signs.

24. The same nurse failed to escalate concerns about Plaintiff's lack of food and fluid intake, dismissing requests for IV fluids despite Plaintiff's worsening condition and significant blood loss.

25. Defendant's medical team failed to appropriately escalate Plaintiff's care despite clear signs of significant blood loss and deteriorating condition, including documented blood loss exceeding 1600ml through the chest tube.

26. As a result of Defendant's negligence, Plaintiff suffered a near-fatal blood loss of approximately 4 liters, requiring emergency surgery and multiple blood transfusions.

27. During the emergency thoracotomy, it was discovered that Plaintiff's diaphragm tear had worsened to 12 inches, and his liver had moved into his right lung space. Due to the urgency of the situation, a rib was broken during the procedure.

28. Following discharge on February 23, 2024, Defendant failed to prescribe necessary blood thinners, despite Plaintiff receiving daily blood thinner injections during his hospitalization.

29. As a result of this failure, Plaintiff suffered a pulmonary embolism on March 8, 2024, requiring additional hospitalization for two days and ongoing blood thinner treatment.

### III. CAUSES OF ACTION

_____7_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

## FIRST CAUSE OF ACTION

## DEPRIVATION OF CONSTITUTIONAL RIGHTS
## (FOURTEENTH AMENDMENT – DELIBERATE INDIFFERENCE TO
## SERIOUS MEDICAL NEEDS)

30. Plaintiff incorporates by reference paragraphs 1 through 29 of this First Amended Complaint as if fully set forth herein.

31. At all relevant times, Defendants COUNTY OF SAN JOAQUIN and SAN JOAQUIN GENERAL HOSPITAL AUXILIARY (collectively, the Municipal Defendant), and the individual physicians, nurses and employees sued herein as DOES 1 through 100, were acting under color of state law and within the course and scope of their employment such that all acts and omissions alleged herein are attributable to the Municipal Defendant under 42 U.S.C. § 1983.

32. As a pretrial detainee and/or person in the custody of a state-operated facility, Plaintiff had a Fourteenth Amendment right to adequate medical care and protection from punishment. Claims of inadequate medical care by pretrial detainees are governed by an objective deliberate indifference standard: the question is whether the defendants' conduct was objectively unreasonable in light of the known medical risk to the detainee. See Kingsley v. Hendrickson, 576 U.S. 389 (2015) (objective standard for pretrial detainees); see also Ninth Circuit authority applying the objective standard to inadequate medical care claims brought by pretrial detainees.

33. The objectively serious medical need. Plaintiff suffered objectively serious medical conditions while in Defendants' custody — conditions that created an unreasonable risk of

FIRST-AMENDED COMPLAINT FOR DAMAGES

death or serious impairment and that required immediate, competent medical assessment and intervention. As alleged above and in the FAC, Plaintiff presented with traumatic injury and a right-sided hemothorax requiring chest tube management, experienced massive chest drainage (including drainage well in excess of thresholds for urgent escalation), suffered profound blood loss (on information and belief approximately four liters), required emergent thoracotomy and clot evacuation, sustained rib fracture and subsequent pulmonary embolism and other complications. These facts, viewed objectively, establish a serious medical need requiring timely monitoring, notification, transfusion and surgical intervention.

34. The Municipal and individual Defendants had actual, objective notice of Plaintiff's serious medical needs. Plaintiff repeatedly complained of severe, escalating pain (10/10), staff observed continued heavy chest-tube drainage, and treating clinicians issued express nursing instructions requiring notification at specified drainage thresholds; instructions that were not followed or were honored only after clinically significant delay. In addition, objectively abnormal vital signs, visible blood loss, and continuing requests for help by Plaintiff and bystanders put Defendants on notice of the excessive risk to Plaintiff's health. These well-documented, contemporaneous signs and complaints are sufficient to show that Defendants knew, or had objective reason to know, that Plaintiff faced an excessive risk of harm.

35. Deliberate indifference by individual Defendants. Despite objective notice of a life-threatening condition, individual Defendants acted, and failed to act, in a manner that was objectively unreasonable under the circumstances. Specifically, the individual Defendants (a) failed to perform appropriate ongoing assessments and direct-view safety checks adequate to detect clinical deterioration, (b) failed to timely escalate care or summon the responsible physician after drainage exceeded the levels requiring notification, (c) failed to administer or

9

**FIRST-AMENDED  COMPLAINT  FOR DAMAGES**

arrange for timely blood products and other stabilizing treatment called for by the patient's condition, (d) failed to document and communicate critical observations, and (e) proceeded with or permitted invasive interventions without lawful informed consent and without appropriate follow-up monitoring. These acts and omissions, taken together and in the totality of the circumstances, constituted deliberate indifference to Plaintiff's serious medical needs because they were objectively unreasonable and posed an excessive risk of harm.

36. Municipal liability (policy, custom, or failure to train). The Municipal Defendant is liable under § 1983 because the constitutional violations described above were caused by the execution of official municipal policy, longstanding custom, or by a deliberate failure to train or supervise medical staff. Under Monell and its progeny, a municipality is responsible where its own policies or customs cause constitutional injury and where a failure to train manifests deliberate indifference to the constitutional rights of those in its care. See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); City of Canton v. Harris, 489 U.S. 378 (1989).

37. Specific municipal policies, customs, and training failures. On information and belief, and based on the Municipal Defendant's records and practices, the constitutional violations alleged herein resulted from one or more of the following interrelated municipal policies, customs, or failures: (a) a systemic failure to staff emergency and trauma areas consistent with patient acuity; (b) inadequate, inconsistent or non-existent escalation protocols for post-procedure chest-tube drainage that did not require timely notification and action when drainage exceeded safe thresholds; (c) deficient training, supervision, credentialing and competency assessment for nurses and physicians responsible for triage, chest-tube management, and monitoring of trauma patients; (d) absence or dysfunction of direct-view safety check procedures and inadequate monitoring schedules; and (e) failure to meaningfully

10

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

investigate, remediate, or discipline after prior similar incidents or complaints, such that policymakers were on notice of the risk to patients. These systemic failures were a proximate cause of the injuries alleged herein.

38. On information and belief, the Municipal Defendant had actual and constructive notice of the foregoing deficiencies through prior complaints, incident reports, sentinel events, internal audits, morbidity and mortality reviews, grievances, and regulatory citations (all of which put municipal policymakers on notice that their practices created an unreasonable risk of harm). Despite such notice, the Municipal Defendant failed to implement corrective policies, adequate training programs, or enforce basic safety checks, and thus was deliberately indifferent to the constitutional rights of detainees such as Plaintiff. The Municipal Defendant's municipal conduct and omissions were a moving force in producing Plaintiff's injuries, including prolonged hemorrhage, emergency thoracotomy, permanent impairment and subsequent complications described in the FAC. See Castro v. County of Los Angeles; Gordon v. County of Orange (applying the objective standard and recognizing pretrial detainees' right to appropriate screening and safety checks).

39. Municipal and supervisory liability to be proved at trial. The Municipal Defendant's policies, customs, practices and failures to train and supervise were the proximate cause of the injuries alleged herein. The deprivation of Plaintiff's constitutional rights was not the product of a single, isolated error but of a pattern and practice of systemic failures that amounted to deliberate indifference by the Municipal Defendant and its policymakers.

40. As a direct and proximate result of the conduct described above, Plaintiff suffered severe physical injury, pain, emotional distress, economic loss and other damages. Plaintiff

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

seeks compensatory damages, punitive damages against the individual defendants where appropriate, declaratory and injunctive relief to reform the unconstitutional practices described above, an award of attorneys' fees and costs under 42 U.S.C. § 1988, and such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION
## FEDERAL TORT CLAIMS ACT (FTCA) –
## NEGLIGENCE OF A FEDERAL EMPLOYEE

41. Plaintiff incorporates by reference paragraphs 1 through 36 as though fully set forth herein.

42. To the extent that any individual defendant, specifically those designated as DOE Defendants 51–100, was at all relevant times an employee, officer, or agent of the United States of America, including, without limitation, the United States Public Health Service, the Department of Health and Human Services, or any federally supported medical facility, acting within the course and scope of such federal employment, this claim arises under the **Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2401(b), 2671–2680.**

43. The **United States of America** is therefore the proper party defendant and is **substituted** in place of any such individual pursuant to 28 U.S.C. § 2679(d). Under the FTCA, the United States is liable for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government acting within the scope of his or her office or employment, under circumstances where a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred. See **Richards v. United States**, 369 U.S. 1, 6–9 (1962) (holding that the entire law of the state, including its choice-of-law rules, governs FTCA liability).

44. **Jurisdiction and procedural compliance:** Plaintiff has satisfied, or will satisfy prior to judgment, the jurisdictional prerequisites of 28 U.S.C. § 2675(a) by presenting an administrative claim to the appropriate federal agency. Upon denial, or after the statutory six-month period without final disposition, Plaintiff is entitled to institute this civil action. This Court has subject matter jurisdiction under 28 U.S.C. § 1346(b)(1), and venue is proper in this District because the acts and omissions complained of occurred within the County of San Joaquin, California.

45. The **acts and omissions** of the federal employees, including but not limited to physicians, nurses, and other clinical staff who rendered care to Plaintiff, constitute **professional negligence** and **ordinary negligence** under California law. Specifically, these acts include:

a. Failing to recognize and timely diagnose a **right-sided diaphragmatic tear** following Plaintiff's traumatic injury, despite clear clinical and radiographic indicators;

b. **Negligently inserting, monitoring, and managing a chest tube**, including failure to verify placement, monitor output, or respond when output exceeded safe limits;

c. Ignoring repeated and urgent complaints of **10/10 pain, dizziness, pallor, and decreased consciousness**, all of which signaled **massive internal bleeding** and shock;

d. Failing to **notify supervising physicians or escalate care** in accordance with accepted standards and hospital policy;

e. Failing to provide timely **transfusion, stabilization, or surgical intervention**, resulting in the loss of approximately four liters of blood and the need for emergency thoracotomy;

f. Failing to ensure appropriate **post-operative and post-discharge monitoring**, leading to subsequent complications including **pulmonary embolism**, chronic pain, and permanent

_____13_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

impairment; and

g. Failing to obtain and document **informed consent** for invasive procedures and failing to communicate with Plaintiff or his family regarding the risks, alternatives, and potential complications of such interventions.

46. These negligent acts and omissions violated the duty of care owed to Plaintiff under **California Civil Code § 1714**, which imposes a general duty on all persons to exercise reasonable care to avoid causing harm to others, and under **California Civil Code § 3333.2**, which governs the measure of damages in professional negligence actions against health care providers. The conduct of said employees fell below the degree of knowledge, skill, and care ordinarily possessed and exercised by members of their respective professions in similar circumstances, thereby breaching both the **professional standard of care** and the **ordinary standard of due care**.

47. The **United States**, standing in the position of a private employer under the FTCA, is liable in the same manner and to the same extent as a private party under California law for the negligent and wrongful acts and omissions of its employees. See 28 U.S.C. § 1346(b)(1); **Laird v. Nelms**, 406 U.S. 797 (1972) (FTCA liability governed by law of the state where the act occurred).

48. As a **direct and proximate result** of the negligence and wrongful acts described herein, Plaintiff suffered catastrophic injuries, including but not limited to massive internal hemorrhage, hypovolemic shock, a fractured rib from emergent thoracotomy, pulmonary embolism, residual lung impairment, chronic pain, psychological trauma, and other severe and permanent damages. Plaintiff has incurred, and will continue to incur, significant medical expenses, lost earnings, diminished earning capacity, and loss of quality of life.

_____14_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

49. Under 28 U.S.C. § 2674, the United States is liable to Plaintiff for **compensatory damages** in the same manner and to the same extent as a private individual under California law, subject only to the limitations expressly provided by statute. Plaintiff seeks recovery for all such damages, including economic and non-economic losses, in an amount to be proven at trial.

50. Plaintiff further alleges that the negligence described herein was aggravated by the **systemic failure of the federal medical facility to train, supervise, and staff adequately** its emergency and post-surgical units, such that the violations were not isolated acts of individual error but rather reflected a broader pattern of substandard care within the federal entity. This institutional negligence further supports liability under the FTCA.

51. Plaintiff demands judgment against the **United States of America** for compensatory damages in an amount according to proof, together with pre-judgment and post-judgment interest, costs of suit, and such other relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION

### SUPERVISORY LIABILITY
### (FAILURE TO INTERVENE, TRAIN, OR SUPERVISE)

52. Plaintiff incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

53. At all relevant times, DOE Defendants 1 through 50 were supervisory physicians, charge nurses, department heads, and administrative officials employed by Defendant COUNTY OF SAN JOAQUIN and/or SAN JOAQUIN GENERAL HOSPITAL AUXILIARY, acting under color of state law and within the course and scope of their

_____15_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

employment. Each held authority and responsibility over subordinate medical staff directly responsible for Plaintiff's care.

54.    These supervisory Defendants owed a duty to ensure that individuals under their authority provided constitutionally adequate medical care, to intervene when aware of ongoing violations, and to implement proper training, supervision, and discipline to prevent foreseeable constitutional injuries.

55.    Under established law, supervisors may be held liable under 42 U.S.C. §1983 if they (a) personally participated in the constitutional deprivation;

(b) knew of the violations and failed to act to prevent them; or

(c) implemented or maintained policies, customs, or practices that were the moving force behind the violations. See *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011).

56.    Supervisory Defendants knew, or reasonably should have known, that subordinate staff were engaging in conduct that posed a substantial risk of serious harm to Plaintiff. Through patient charting, vital sign records, nurse reports, and direct observation, these supervisors were on notice of:

a. Rapid and excessive blood accumulation in the chest-tube pleuravac, exceeding hospital thresholds for emergency intervention;

b. Plaintiff's repeated and documented complaints of excruciating 10/10 pain, shortness of breath, pallor, and loss of consciousness;

c. Abnormal and deteriorating vital signs consistent with hypovolemic shock; and

FIRST-AMENDED COMPLAINT FOR DAMAGES

d. Nursing staff's failure to escalate the case or notify attending physicians as required by trauma-care and emergency response policy.

57.    Despite this knowledge, supervisory Defendants failed to intervene or to ensure corrective action was taken. They did not review Plaintiff's chart, order emergency evaluation, initiate blood transfusion or imaging, or otherwise ensure adherence to basic trauma protocols. This deliberate inaction in the face of known danger constitutes reckless or callous indifference to Plaintiff's rights. See *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *Redman v. County of San Diego*, 942 F.2d 1435, 1447–49 (9th Cir. 1991) (en banc).

58.    Independently, and in addition, supervisory Defendants failed to properly train and supervise subordinate personnel. They knew that training and oversight within the hospital were grossly inadequate, as evidenced by prior incidents, internal audits, and staff complaints revealing systemic breakdowns in trauma and post-operative monitoring.

59.    The areas of failure included:

a. Recognizing and responding to internal bleeding, chest-tube malfunction, or hemodynamic instability;

b. Proper charting and communication of vital signs and chest-tube output;

c. Escalation procedures requiring immediate physician notification upon abnormal patient data;

d. Pain management standards and the duty to respond to acute distress; and

e. Procedures for obtaining and documenting informed consent.

60.    Despite awareness of these deficiencies, supervisory Defendants failed to implement corrective training, discipline negligent staff, or revise protocols to protect patient safety.

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

Their conscious disregard for these risks constitutes deliberate indifference as defined in *City of Canton v. Harris*, 489 U.S. 378, 388 (1989), and *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002).

61.    The collective failures of these supervisory Defendants—both to intervene during Plaintiff's medical crisis and to provide adequate training and oversight—were a moving force behind the constitutional deprivations suffered by Plaintiff. Their omissions foreseeably caused and directly contributed to Plaintiff's catastrophic injuries, including massive hemorrhage, emergency thoracotomy, pulmonary embolism, permanent impairment, and severe emotional trauma.

62.    As a direct and proximate result of these acts and omissions, Plaintiff sustained substantial physical pain, emotional distress, permanent disability, and economic loss, and continues to suffer ongoing harm.

63.    Plaintiff seeks compensatory and punitive damages against the individual supervisory Defendants in their personal capacities, attorneys' fees pursuant to 42 U.S.C. §1988, and such further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
### SUBSTANTIVE DUE PROCESS VIOLATION
### (STATE-CREATED DANGER)

64. Plaintiff incorporates by reference paragraphs 1 through 63 as though fully set forth herein.

65. The Fourteenth Amendment's Substantive Due Process Clause protects individuals from government conduct that deprives them of liberty or bodily integrity through conscience-shocking acts or through affirmative conduct that places them in danger. Under the *state-created danger* doctrine, liability arises when (1) state actors, by affirmative acts, create or

18

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

expose an individual to a danger they otherwise would not face, and (2) the resulting harm is foreseeable and directly caused by those acts. See *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir. 1989); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061–62 (9th Cir. 2006).

66. Acting under color of state law, the Municipal Defendant and its employees affirmatively created and substantially enhanced the danger to Plaintiff. Once Plaintiff was admitted for treatment following his motor vehicle accident, Defendants assumed exclusive custody and control over his medical care, thereby isolating him from other potential sources of aid. Having accepted responsibility for his safety and well-being, Defendants' affirmative actions and conscious inactions transformed his situation from one of relative stability into a life-threatening emergency wholly of their own making.

67. The affirmative conduct that created or magnified this danger includes, but is not limited to:

a. Performing an invasive chest-tube procedure **without adequate explanation, consent, or assessment**, thereby inflicting a new and unmanaged risk of hemorrhage;

b. **Failing to monitor chest-tube output**, which rapidly exceeded safe levels, and disregarding drainage measurements that objectively indicated internal bleeding;

c. **Ignoring repeated and documented pleas for help**, complaints of severe (10/10) pain, and visible signs of hypovolemic shock;

d. **Dismissing the observations of Plaintiff's companion**—who repeatedly sought medical attention on his behalf, as unfounded or inconvenient; and

e. **Affirmatively instructing staff and visitors to refrain from intervention or escalation**, thereby cutting off alternative avenues of assistance.

Jason Amended Complaint

_____19_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

68. Such actions and omissions were not merely negligent. They constituted a deliberate, reckless disregard for Plaintiff's right to bodily integrity and safety. They "shocked the conscience" because Defendants acted with knowledge of, and deliberate indifference to, an obvious and immediate danger to Plaintiff's life. See *County of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998) (liability where conduct shocks the conscience and shows deliberate indifference to known risks); *Penilla v. City of Huntington Park*, 115 F.3d 707, 710–11 (9th Cir. 1997) (finding state-created danger where officers worsened a medical emergency and left a citizen to die).

69. The state-created danger doctrine is particularly applicable here because Plaintiff's peril arose not from external forces, but from **Defendants' own exercise of government authority**. Defendants used their medical authority to impose a course of treatment that directly precipitated his crisis and then failed to take the basic steps necessary to safeguard his life. These acts transformed Plaintiff from a trauma patient in need of treatment into a patient in active, state-created peril.

70. The danger to Plaintiff was foreseeable and specific. Defendants' own records, policies, and medical training establish that massive chest-tube output, unrelieved pain, and declining vital signs indicate hemorrhage requiring immediate intervention. The refusal to respond to these clear indicators was not a mere lapse of judgment—it was a willful disregard of known, life-threatening risks that any reasonable clinician would recognize.

71. By affirmatively creating or greatly increasing the danger to Plaintiff through their own conduct, and then abandoning him to the consequences of that danger, Defendants violated his substantive due process right to bodily integrity and security of person. These violations directly caused Plaintiff's catastrophic injuries, including near-fatal hemorrhagic

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

shock, emergency thoracotomy, prolonged hospitalization, pulmonary embolism, chronic disability, and emotional trauma.

72. As a direct and proximate result of Defendants' conscience-shocking conduct, Plaintiff suffered severe physical, emotional, and economic harm. Plaintiff seeks compensatory damages against the Municipal Defendant and the individual actors in their personal capacities, together with punitive damages where legally permissible, attorneys' fees under 42 U.S.C. § 1988, and such further relief as the Court deems just and proper.

## FIFTH CAUSE OF ACTION
## FOURTH AMENDMENT VIOLATION (UNREASONABLE SEIZURE THROUGH FORCED MEDICAL TREATMENT)

73. Plaintiff incorporates by reference paragraphs 1 through 72 as though fully set forth herein.

74. At all relevant times, Defendants, acting under color of state law, performed, authorized, or acquiesced in an **unreasonable seizure of Plaintiff's person** within the meaning of the Fourth and Fourteenth Amendments when they carried out a physically invasive medical procedure, the **chest-tube insertion**, without Plaintiff's voluntary and informed consent.

75. A seizure occurs when government officials, by means of physical force or show of authority, restrain the liberty or bodily integrity of a person. The **placement of a chest tube** constitutes an invasive, forced physical intrusion into the body and thus a seizure subject to the Fourth Amendment's reasonableness requirement. See *Winston v. Lee*, 470 U.S. 753, 759–66 (1985); *George v. Edholm*, 752 F.3d 1206, 1216–19 (9th Cir. 2014) (forced medical procedure without valid consent constitutes unreasonable seizure).

_____**21**_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

76. Plaintiff never provided **valid, informed consent** to this procedure. Defendants failed to disclose the material risks, benefits, and alternatives, including the likelihood of hemorrhage, the need for surgical backup, and the availability of less invasive monitoring, thereby vitiating any purported consent. Without such disclosure, any consent obtained was uninformed, involuntary, and constitutionally invalid.

77. Under *Winston v. Lee*, the reasonableness of a medical intrusion is determined by balancing (1) the individual's expectation of privacy and security against (2) the government's interest and (3) the extent of the bodily intrusion. Here, Plaintiff's interest in bodily integrity was paramount: the procedure involved penetration of the chest wall and placement of a drainage tube near vital organs, posing grave risks. The government's interest in proceeding without informed consent was minimal; there were no exigent circumstances, no imminent threat to others, and no lawful warrant or judicial authorization. On balance, the intrusion was unreasonable.

78. Defendants' conduct was not the product of a legitimate emergency. The chest-tube procedure was **non-urgent** at the moment of initiation and could have awaited informed consent or consultation. Defendants' choice to proceed regardless of Plaintiff's lack of understanding or opportunity to refuse constituted an **unreasonable and unlawful seizure** of his person.

79. This conduct mirrors the kind condemned in *George v. Edholm*, where a forced nasogastric procedure was held unconstitutional because the patient's consent was invalid and the medical intrusion was unsupported by necessity or exigency. As in *George*, Defendants'

_____22_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

actions here "shocked the conscience" and violated Plaintiff's Fourth Amendment right to be secure in his person.

80. As a direct and proximate result of this unconstitutional seizure, Plaintiff suffered the very harms that the Fourth Amendment protects against: unwanted physical intrusion, loss of bodily autonomy, and severe physical injury. Specifically, he endured catastrophic hemorrhaging, emergency thoracotomy, and lasting impairment arising directly from the unauthorized and unreasonable procedure.

81. Plaintiff seeks compensatory damages for physical and emotional injury, punitive damages against the individual Defendants to deter future constitutional violations, reasonable attorneys' fees under 42 U.S.C. § 1988, and such other relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION
### MEDICAL BATTERY
### (LACK OF CONSENT)

82. Plaintiff incorporates by reference paragraphs 1 through 81 as though fully set forth herein.

83. At all relevant times, Defendants, including DOE medical personnel acting within the course and scope of their employment, owed Plaintiff a duty to obtain his valid consent before performing any invasive medical procedure. A health care provider commits a battery when they perform a procedure without the patient's consent or materially exceed the scope of the consent given. See *Cobbs v. Grant*, 8 Cal. 3d 229, 239–41 (1972); *Ashcraft v. King*, 228 Cal. App. 3d 604, 609–10 (1991).

---

**23**

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

84. Defendants intentionally performed an invasive chest-tube insertion on Plaintiff without his informed, voluntary, and knowing consent. Prior to the procedure, Defendants failed to adequately explain the nature of the procedure, its significant risks, including hemorrhage, internal organ injury, and surgical escalation, its alternatives, and the potential consequences of refusal.

85. Plaintiff neither provided nor could have provided valid consent under these circumstances because he was uninformed, in distress, and was not afforded a meaningful opportunity to refuse or seek clarification. Any purported consent was invalid, vitiated by the Defendants' omissions and the coercive environment created by their authority and Plaintiff's medical dependency.

86. The chest-tube insertion thus constituted an **unauthorized physical invasion of Plaintiff's body**, exceeding the scope of any consent and amounting to an intentional tort. The intrusion was not justified by emergency necessity, as Plaintiff was stable and communicative and there were no exigent circumstances that precluded informed consent.

87. Under California law, an unauthorized medical procedure performed without valid consent constitutes a battery irrespective of the provider's intent to cause harm. Defendants are therefore liable for all injuries directly resulting from their non-consensual conduct, including the severe internal bleeding, emergency thoracotomy, and subsequent permanent physical impairment and emotional distress suffered by Plaintiff.

88. The conduct of the individual Defendants was malicious, oppressive, and in reckless disregard of Plaintiff's rights to bodily autonomy and informed self-determination, warranting an award of **punitive damages** to deter similar conduct in the future.

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

89. As a direct and proximate result of the medical battery described above, Plaintiff sustained significant physical injury, emotional trauma, medical expenses, and economic losses. Plaintiff seeks compensatory and punitive damages, costs of suit, and such other and further relief as the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

90. Plaintiff incorporates by reference paragraphs 1 through 89 as though fully set forth herein.

91. At all relevant times, Defendants, including DOE Defendants 1 through 100, owed Plaintiff a duty to refrain from conduct that would cause severe emotional distress through outrageous or reckless disregard of his rights and physical suffering.

92. Under California law, a defendant is liable for intentional infliction of emotional distress when:

(1) the defendant's conduct is extreme and outrageous;

(2) the defendant intends to cause emotional distress, or acts with reckless disregard of the probability of causing emotional distress;

(3) the plaintiff suffers severe emotional distress; and

(4) the defendant's conduct is a substantial factor in causing that distress. See *Hughes v. Pair*, 46 Cal. 4th 1035, 1050–51 (2009); *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991).

93. Defendants' conduct was **extreme and outrageous**, exceeding all bounds tolerated in a civilized society. Despite Plaintiff's repeated pleas for help, cries of severe

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

(10/10) pain, and visible distress, Defendants, acting under color of state law and within their professional duties, **ignored, mocked, or dismissed his suffering**, refused to administer timely pain relief or summon a physician, and allowed him to deteriorate in plain sight.

94. The indifference and callousness of the Defendants, including their refusal to respond to obvious signs of hemorrhage and impending shock, were not the result of inadvertence or error but of conscious disregard for Plaintiff's humanity and dignity.
Jason Amended Complaint

95. Defendants acted **intentionally or with reckless disregard** for the probability that their actions and omissions would cause severe emotional distress. They were fully aware that Plaintiff was in agony and in fear for his life, yet they chose to do nothing, thereby inflicting profound emotional and psychological trauma.

96. As a direct and proximate result of Defendants' outrageous conduct, Plaintiff suffered **severe emotional distress**, including panic, terror, humiliation, post-traumatic stress symptoms, sleep disturbance, depression, and ongoing psychological harm requiring treatment. The emotional distress was serious, long-lasting, and of such intensity that no reasonable person could be expected to endure it.

97. Defendants' conduct was **malicious, oppressive, and fraudulent**, warranting the imposition of punitive damages under California Civil Code § 3294. Their behavior demonstrated a conscious disregard for Plaintiff's rights and for the fundamental obligations of medical professionals toward those in their care.

_____26_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

98. As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer severe emotional distress, physical pain, and economic losses. Plaintiff seeks compensatory and punitive damages, costs of suit, and all further relief deemed just and proper by the Court.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (NIED)

99. Plaintiff incorporates by reference paragraphs 1 through 98 as though fully set forth herein.

100. At all relevant times, Defendants, including DOE Defendants 1 through 100, owed Plaintiff a duty to exercise reasonable care in the provision of medical services, post-operative monitoring, and patient communication, so as to avoid causing foreseeable physical and emotional harm. Under California Civil Code §1714, every person is responsible for injuries occasioned to another by their want of ordinary care. This duty includes the obligation of medical professionals to avoid subjecting patients to unnecessary suffering and emotional trauma arising from negligent care or abandonment.

101. California recognizes a cause of action for negligent infliction of emotional distress when a defendant, through negligent acts or omissions, causes serious emotional distress to a foreseeable and direct victim of the negligence. See *Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 930 (1980); *Burgess v. Superior Court*, 2 Cal.4th 1064, 1072–1074 (1992). A patient receiving negligent medical treatment is a direct victim of such conduct.

102. Plaintiff was a direct victim of Defendants' negligent acts and omissions. Defendants accepted responsibility for Plaintiff's care upon admission and thereby created a

FIRST-AMENDED COMPLAINT FOR DAMAGES

special relationship that gave rise to a duty to safeguard his physical and emotional well-being. The foreseeable risk of emotional trauma inherent in their conduct, subjecting Plaintiff to extreme pain, neglect, and fear of death, renders this harm compensable under California law.

103. Defendants breached their duty of care by engaging in conduct that fell egregiously below accepted medical standards, including but not limited to:

a. Failing to properly assess and monitor Plaintiff after placement of a chest tube, despite explicit physician orders requiring close observation and immediate notification if output exceeded defined limits;

b. Ignoring repeated reports of nursing staff and visible indications of rapid blood loss;

c. Dismissing Plaintiff's urgent, repeated pleas for help while he reported excruciating 10/10 pain, pallor, dizziness, and difficulty breathing;

d. Refusing or delaying appropriate medical intervention despite clear evidence of hypovolemic shock and deteriorating consciousness;

e. Failing to communicate truthfully with Plaintiff or his loved ones regarding his condition and prognosis, leaving him terrified, isolated, and uninformed; and

f. Allowing Plaintiff to remain in this deteriorating and helpless state for an extended period, culminating in massive hemorrhage and emergency thoracotomy.

104. Defendants knew or reasonably should have known that a patient enduring unrelieved, life-threatening pain and neglect would suffer not only physical injury but also severe emotional distress, including terror, hopelessness, humiliation, and psychological trauma. The harm to Plaintiff's emotional well-being was a natural and foreseeable consequence of Defendants' grossly negligent behavior.

_____28_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

105. Plaintiff's emotional distress was immediate, intense, and prolonged. During the hours of uncontrolled bleeding, Plaintiff experienced the conscious fear that he was dying, repeatedly called for assistance that never came, and believed that hospital staff had abandoned him. After his emergency thoracotomy, he continued to experience nightmares, panic attacks, flashbacks of suffocation and helplessness, anxiety triggered by medical settings, and persistent symptoms of post-traumatic stress.

106. The emotional and psychological injuries suffered by Plaintiff were serious and verifiable, resulting in ongoing therapy and medical treatment. Plaintiff has been diagnosed with trauma-related symptoms consistent with Post-Traumatic Stress Disorder, depression, and related caused by the Defendants' negligent conduct and by reliving the event.

107. The duty to prevent this emotional harm was heightened because Defendants were medical professionals entrusted with protecting Plaintiff's life and dignity. Their role created a special relationship imposing an affirmative duty to act with compassion, vigilance, and care. Their failure to do so constitutes not only medical negligence but a profound breach of trust that foreseeably caused devastating emotional injury.

108. Defendants' conduct was so indifferent and reckless that it reflected a disregard for the emotional consequences of their inaction. Their refusal to respond to obvious signs of crisis, despite training and experience, evidences willful neglect of a patient's emotional and physical welfare.

109. As a direct and proximate result of Defendants' negligence, Plaintiff suffered severe emotional distress manifested by mental anguish, emotional pain, sleep disturbances,

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

and physical symptoms such as shortness of breath. Such harms persist and continue to interfere with Plaintiff's daily functioning, personal relationships, and overall quality of life.

110. Plaintiff has incurred and will continue to incur medical and psychological expenses as a result of this trauma. The emotional distress is compensable as a direct injury to Plaintiff, independent of his physical injuries.

111. Plaintiff seeks general and special damages for past and future pain, suffering, and emotional distress, the costs of psychological and medical care, and all other damages recoverable under California law. Plaintiff also seeks costs of suit and any additional relief the Court deems just and proper.

## JURY TRIAL DEMANDED

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that judgment be entered in his favor and against all Defendants, jointly and severally, as follows:

**On Each and Every Cause of Action:**

1. **General, Actual, Compensatory, Consequential, and Special Damages:** For an award of such damages, including economic and non-economic losses, in an amount according to proof at trial, but not less than **$672,000**, or such other amount as the evidence may establish;

FIRST-AMENDED COMPLAINT FOR DAMAGES

2.  **Emotional Distress and Pain and Suffering:** For damages for past and future physical pain, mental anguish, emotional distress, loss of enjoyment of life, and diminished quality of life, in an amount according to proof;

3.  **Punitive and Exemplary Damages:** For an award of punitive and exemplary damages against the individual Defendants sued in their personal capacities, to the extent permitted by law, for willful, wanton, malicious, or reckless disregard of Plaintiff's constitutional and statutory rights;

4.  **Restitution and Equitable Relief:** For restitution, disgorgement, and all other appropriate equitable relief necessary to restore Plaintiff and prevent unjust enrichment;

5.  **Attorneys' Fees and Costs:** For recovery of reasonable attorneys' fees and litigation costs pursuant to **42 U.S.C. §1988**, the **Federal Tort Claims Act**, and applicable provisions of California law;

6.  **Pre- and Post-Judgment Interest:** For pre-judgment and post-judgment interest at the legal rate from the date of injury until paid;

7.  **Declaratory and Injunctive Relief:** For such declaratory and injunctive relief as the Court deems necessary to prevent continuation of the unconstitutional practices,

_____31_____

**FIRST-AMENDED COMPLAINT FOR DAMAGES**

customs, and policies described herein; and

8. **Further Relief:** For such other and further legal and equitable relief as the Court may deem just, proper, and equitable in the interests of justice.

**DATED:** October 07, 2025.                    **LAW OFFICE OF RESHMA KAMATH**

*/S/ Reshma Kamath*

**RESHMA KAMATH,**
Counsel for PLAINTIFF **JASON ALLEN WHITE**

_____32_____

**FIRST-AMENDED  COMPLAINT  FOR DAMAGES**

## VERIFICATION

I, JASON WHITE individually as PLAINTIFF in the above-entitled action. I have read the foregoing and know the contents thereof. The matters stated therein are true of my own knowledge, except as to those matters that are therein stated on information and belief, and Concerning those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and Correct. Executed in the County of Contra Costa, California.

DATED: 10/7/2025,

_____
JASON WHITE,

_____
**COMPLAINT FOR DAMAGES**